## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| MYRA R. RUTTENBERG, | ) | FILED: AUGUST 26, 2008 |
| | ) | 08CV4898 |
| Plaintiff, | ) | JUDGE MAROVICH |
| v. | ) | MAGISTRATE JUDGE VALDEZ |
| | ) | |
| GEOFFREY W. RUTTENBERG, DAVID W. | )  Case No. | |
| RUTTENBERG a/k/a BUZZ RUTTENBERG, | ) | PH |
| JEROME MEYER, in his capacity as trustee of | ) | |
| THE ALDINE TRUST, and 2002 NORTH | ) | |
| MOHAWK, LLC | ) | |
| | ) | |
| Defendants. | ) | |

## NOTICE OF REMOVAL OF CIVIL ACTION

Pursuant to 28 U.S.C. §§ 1331, 1441(c), and 1446, Defendants Geoffrey W. Ruttenberg, David W. Ruttenberg, Jerome Meyer, in his capacity as trustee of the Aldine Trust, and 2002 North Mohawk, LLC by and through their attorneys, file this Notice of Removal of the above-entitled action from the Circuit Court of Cook County Illinois, where it is currently pending, to the United States District Court for the Northern District of Illinois, Eastern Division.  In support of this Notice of Removal, Defendants state as follows:

1.      Plaintiff Myra Ruttenberg ("Myra") and her husband, Defendant Geoffrey Rutternberg ("Geoffrey"), are in the middle of a divorce proceeding pending in the Circuit Court of Cook County, 08 D 319.

2.      On August 14, 2008, Plaintiff Myra filed a second lawsuit in the Circuit Court of Cook County against Geoffrey, her father-in-law, David, and the other Defendants in a complaint titled *Ruttenberg v. Ruttenberg, et al.*, 08 L 8997.  A true and correct copy of the Complaint is attached hereto as Exhibit A.

3.      In her complaint, Plaintiff alleges, among other things, that the defendants supposedly conspired to fraudulently transfer assets from the marital estate to third-parties.

Count III of the six-count complaint is for "Civil RICO" arising under 18 U.S.C. 1961, and is filed against all defendants. (See Ex. A, ¶¶ 46-58.)

4.    Count III for Civil RICO is an action over which this Court has original jurisdiction pursuant to 28 U.S.C. § 1331. Even though common law claims are appended to the RICO action, the "entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters in which State law predominates." 28 U.S.C. 1441(c)

5.    The Plaintiff's Complaint and Summons were served on David Ruttenberg on August 19, 2008 and Jerome Meyer on August 22, 2008. 2002 North Mohawk, LLC and Geoffrey Ruttenberg have not been served.[1] This was their first receipt by any of the Defendants of the Complaint. Pursuant to 28 U.S.C. § 1446(b), this Notice of Removal is timely filed within thirty (30) days after the initial receipt by the Defendants of the Plaintiff's Complaint and Summons.

6.    Pursuant to 28 U.S.C. § 1446(d), contemporaneously with the filing of this Notice of Removal, the Defendants served a true and correct copy of this Notice of Removal and attachments on the Plaintiff through her counsel. Defendants have also filed a Notice of Removal with the Clerk of the Circuit Court, Cook County, Illinois.

7.    Pursuant to 28 U.S.C. § 1446(a), copies of the Summons and the Complaint, constituting all the process and pleadings served upon the Defendants in the state court action, are attached hereto as Exhibit A.

---

[1]    Plaintiff's process server left multiple copies of the complaint at Mr. David Ruttenberg's office in his absence. While Defendants would not agree that such service is effective personal service, they will use August 19, 2008 as the "first receipt" of the complaint for purposes of this Notice of Removal.

8.    Venue is proper in this district because the claim allegedly arose out of a transaction which took place within this district.

**WHEREFORE**, the Defendants Geoffrey W. Ruttenberg, David W. Ruttenberg, Jerome Meyer in his capacity as the Trustee of the Aldine Trust and 2002 North Mohawk, LLC  notice that the above-entitled action, which was pending in the Circuit Court of Cook County, is now removed to the United States District Court for the Northern District of Illinois, Eastern Division and requests this Court accept the removal of this case.

Dated:  August 26, 2008                          Respectfully submitted,

**DAVID   W.   RUTTENBERG,   GEOFFREY RUTTENBERG,   2002   NORTH   MOHAWK, LLC**
By:   ___/s/ John D. Burke_____
     One of Their Attorneys

**JEROME MEYER, in his capacity as trustee of the Aldine Trust**
By:   ___/s/ John Chen_____
     One of Their Attorneys

John D. Burke (ARDC No. 06203918)
**ICE MILLER LLP**
200 West Madison, Suite 3500
Chicago, Illinois 60606
(312) 726-8148

Tom Hayes
**ICE MILLER LLP**
2300 Cabot Drive, Suite 455
Lisle, Illinois 60532
(630) 857-7616

John Chen (ARDC No. 06193906)
**Chen Nelson Roberts Ltd**.
203 N. LaSalle St., 15th Floor
Chicago, IL 60601
(312) 782-5630

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing has been served via messenger on the 26th day of August, 2008, addressed to:

> David I. Grund
> Grund & Leavitt, P.C.
> 812 North Dearborn Street
> Chicago, Illinois 60610-3317

/s/ John D. Burke
John D. Burke

C/69603.1

08CV4898
JUDGE MAROVICH
MAGISTRATE JUDGE VALDEZ

PH

# EXHIBIT A

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| SUMMONS | ALIAS - SUMMONS | (8/01/08) CCG N001 |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT, __LAW__ DIVISION

No. _____

MYRA R. RUTTENBERG

_____ (Name all parties)

v.

GEOFFREY W. RUTTENBERG, DAVID W. RUTTENBERG et al

2008L008997
CALENDAR/ROOM V
TIME 00:00
Fraud

### SUMMONS

To each Defendant: DAVID RUTTENBERG, 432 WEST GRANT PLACE, APARTMENT '4E, CHICAGO, ILLINOIS, 60614

**YOU ARE SUMMONED** and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

☑ Richard J. Daley Center, 50 W. Washington, Room _____, Chicago, Illinois 60602

☐ **District 2 - Skokie**    ☐ **District 3 - Rolling Meadows**    ☐ **District 4 - Maywood**
     5600 Old Orchard Rd.        2121 Euclid               1500 Maybrook Ave.
     Skokie, IL 60077           Rolling Meadows, IL 60008     Maywood, IL 60153

☐ **District 5 - Bridgeview**    ☐ **District 6 - Markham**        ☐ **Child Support**
     10220 S. 76th Ave.        16501 S. Kedzie Pkwy.       28 North Clark St., Room 200
     Bridgeview, IL 60455      Markham, IL 60426          Chicago, Illinois 60602

**You must file within 30 days after service of this Summons, not counting the day of service.**
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

**To the officer:**

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

Atty. No.: 40,447                  WITNESS, August _14_ , 2008

Name: Grund & Leavitt, P.C.

Atty. for: Myra R. Ruttenberg              _____

Address: 812 North Dearborn Street         Clerk

City/State/Zip: Chicago, Illinois 60610      Date of service: _____

Telephone: (312) 640-0500             (To be inserted by officer on copy left with defendant or other person)

Service by Facsimile Transmission will be accepted at: _____
                                          (Area Code)   (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

Attorney No. 40447

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT—LAW DIVISION

| | | |
|---|---|---|
| MYRA R. RUTTENBERG, | ) | |
| | ) | |
| Plaintiff, | ) | 2008L008997 |
| | ) | CALENDAR/ROOM V |
| v. | ) | TIME 00:00 |
| | ) | Fraud |
| | ) | NO. |
| GEOFFREY W. RUTTENBERG, | ) | |
| DAVID W. RUTTENBERG a.k.a. BUZZ | ) | TRIAL BY JURY OF 12 DEMANDED |
| RUTTENBERG, JEROME MEYER, in his | ) | |
| capacity as Trustee of THE ALDINE TRUST, | ) | |
| and 2002 NORTH MOHAWK, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

### COMPLAINT

NOW COMES the Plaintiff, **Myra R. Ruttenberg ("Myra")**, by and through her attorneys,

Grund & Leavitt, P.C., and complains of the Defendants, **Geoffrey W. Ruttenberg ("Geoffrey")**,

**David W. Ruttenberg a.k.a. Buzz Ruttenberg ("Buzz")**, **the Aldine Trust**, and **2002 North**

**Mohawk, LLC ("the LLC")** as follows:

### COUNT I—COMMON-LAW FRAUD

1. On August 29, 1998, Myra (born: 03/28/69) and Geoffrey (born: 12/20/66) were

lawfully married in Chicago, Illinois, and their marriage was duly registered in Cook County.

2. During the course of their marriage, the parties had two children, *viz.*, **Alexander**

**Ruttenberg** (born: 06/23/03) and **Lily Ruttenberg** (born: 07/13/05).

3. On December 14, 2005, Myra filed a petition for dissolution of marriage against

Geoffrey with this Court. The circuit court clerk assigned this action case number **2005 D 13191**.

4.     On January 12, 2006, Geoffrey filed his answer and counter-petition for dissolution of marriage against Myra.

5.     Thereafter, Geoffrey successfully initiated a reconciliation with Myra and, on May 23, 2006, case number 2005 D 13191 was voluntarily dismissed.

6.     Geoffrey's reconciliation with Myra was not sincere. Rather, it was a ruse or strategic withdrawal to give Geoffrey — with the assistance of his father Buzz — time to withdraw and secret assets and income from the marital estate.

7.     On January 11, 2008, a regrouped Geoffrey filed his "Petition for Dissolution of Marriage" against Myra, thereby initiating the instant divorce proceedings. The circuit court clerk has assigned this action case number **08 D 319**. In both the dismissed case and current proceedings, Geoffrey was represented by the law firm of Berger│Schatz.

8.     On February 7, 2008, Myra filed her "Answer and Counter-Petition for Dissolution of Marriage" against Geoffrey. The instant dissolution proceedings follow.

9.     Geoffrey's father, Buzz has been a successful real-estate developer and lawyer for approximately the past 42 years. Buzz owns and manages several businesses. **Belgravia Group, Ltd.** and **LakeWest, Inc.** are his real-estate development companies. Buzz primarily develops high-end residential real estate.

10.     Ruttenberg & Ruttenberg is Buzz's law firm. While he has not filed an appearance, Buzz has been, acting as Geoffrey's co-counsel with Berger│Schatz in these divorce proceedings. Indeed, Buzz regularly confers with Berger│Schatz on Geoffrey's divorce case.

11.     Geoffrey followed in the footsteps of his father and is also a developer of high-end, residential real estate. However, Geoffrey is not an attorney.

–2–

12.     On or about 1991, Buzz's mother (Geoffrey's paternal grandmother), **Sarah Jean Ruttenberg**, created the Aldine Trust, whose sole beneficiary is Buzz. The trustee for the Aldine is **Jerome Meyer**. Buzz is not only the sole beneficiary of the trust but also has been its attorney since its inception.

13.     In 2004, Geoffrey, as both a developer and a "Class C" member/investor, formed **600 Fairbanks Court LLC** in order to develop a multi-million-dollar, high-rise condominium, located at 600 N. Fairbanks Court in Chicago. A copy of the "600 Fairbanks Court Limited Liability Company Agreement" is attached hereto and incorporated herein as **Exhibit "1."** According to this agreement, Geoffrey is listed as both the manager of the project and a Class C member/investor under GWR Investment LLC, a company under his control.

14.     On April 10, 2006, the Aldine Trust received $1,770,888 as and for its "interest" in the Fairbanks project. However, there are no written documents evincing the Aldine Trust having ever acquired any interest in this project. According to Buzz, Geoffrey came to Buzz in Buzz's capacity as the lawyer for and sole beneficiary of the Aldine Trust, and asked if the trust could provide interim financing for this real-estate project. However, the Aldine Trust never provided Geoffrey's project with any such interim financing. In fact, the trust provided Geoffrey with no capital whatsoever. The trust purportedly provided only an oral "commitment" to supply funds if need be. Further, according to Buzz, the Aldine Trust had a minority interest in the Fairbanks project which was held nominally by Geoffrey for the benefit of the trust. Again however, there exists no written agreement between Geoffrey and the trust formalizing Geoffrey's status as nominee, nor was Geoffrey's status as nominee listed in the 600 Fairbanks Court LLC organization documents.

--3--

15.     Thus, despite providing Geoffrey and his project with no money whatsoever, the Aldine Trust nevertheless received almost $2 million in April 2006 — approximately four months after Myra initially filed for divorce in case number 2005 D 13191.  In contrast, Geoffrey — the manager, developer, and Class C member/investor of the Fairbanks project — received nothing; nor did he receive any associated management, development or brokerage fees, which are customary for his efforts.

16.     Just as with the Fairbanks project, Geoffrey and Buzz have had a similar "relationship" in various other recent projects; namely, 3607-11 Bosworth, LLC, 3546-48 Janssen, LLC and CA-23.

17.     For example, in January 2005, the Aldine Trust acquired a Class B membership interest in 3607-11 Bosworth LLC, for $1,000 and, allegedly made the oral commitment to provide additional capital if need be.  Again, Geoffrey was to be the project manager and developer.  In August 2006, the Aldine Trust received approximately $400,000 in income as and for its $1,000 investment in the Bosworth project.

18.     Likewise, Geoffrey was also the manager and developer for 3546-48 Janssen, LLC. Once again, there is no evidence of any initial or subsequent capital outlay by the Aldine Trust, which allegedly made an oral commitment to provide additional capital if need be.  However, on August 25, 2006, the trust received a check for $397,625, and, on October 5, 2006, it received another check for $600,000.  This totals almost $1 million as and for the trust's return on initial "investment" of zero.

19.     In April 2006, while in the throws of the first divorce action (2005 D 13191), Geoffrey formed another limited-liability company, C/A23, LLC, for the purpose of developing a $23-million, 48-condominium, high-rise located in Chicago.  Geoffrey named himself the manager and developer of the project without any ownership interest.  He gave the entire equity ownership (Class B) to the Aldine Trust for $1,000.  The development is projected to yield approximately $2 million to Aldine after the other members (Class A) get repaid.  Meanwhile, Geoffrey has borrowed in excess of $15 million from a bank, has given his personal guarantee for this debt, has devoted almost all of his energies to the project's development (which is about one third complete), and thus far has received no compensation.

20.     Additionally, the Aldine Trust has extended its reach to the parties' marital residence located at 2002 North Mohawk Street in Chicago.  On or about October 2003, Geoffrey and Myra acquired the lot located at 2002 North Mohawk Street in joint tenancy for the purposes of designing and building a family residence.  At that time, Buzz purportedly gave Geoffrey and Myra a personal check for $300,000 to purchase the lot.  Because the home would take approximately two years to construct, Myra and Geoffrey remained at their residence at 55 West Goethe Street in Chicago.

21.     On or about Spring 2004, Myra and Geoffrey decided that they wanted to live elsewhere.  Geoffrey promised Myra that they would obtain another residence and sell Mohawk to fund the purchase of the new residence.  Geoffrey, a successful real-estate developer, told Myra that he would sell Mohawk for their mutual benefit by including it in and along with his other real-estate development projects.

–5–

22.    As a result of Geoffrey's promise and at his urging, Myra quit-claimed her interest in the realty to **2002 North Mohawk, LLC ("the LLC")** on or about July 2004.

23.    Thereafter, without Myra's knowledge and in breach of his promise to her, Geoffrey arranged for 99% of the LLC to be owned by the Aldine Trust. Geoffrey retained a 1% interest in the LLC in the name of the Brixton Group, Geoffrey's real-estate development corporation which he claims to have formed prior to the parties' marriage.

24.    On or about December 2006, Myra and Geoffrey sold the Goethe Street residence and moved into the Mohawk Street residence because it had not sold. They lived in the Mohawk residence until Geoffrey forced Myra out (along with the parties' children) in January 2008, when he filed the instant divorce proceedings against her.

25.    On April 30, 2008, Geoffrey, without the consent or knowledge of Myra, contracted for the sale of 2002 North Mohawk for $3,000,000.

26.    According to Buzz, the Aldine Trust "repaid" Buzz the original $300,000 that he had allegedly personally "loaned" to Geoffrey and Myra (despite the fact that there exists no promissory note) and the trust is now the holder of this purported "obligation" and 99% owner of the residence through the LLC.

27.    A common thread in all of these transactions is that there is no written contract or other document evincing the terms of the agreement between Geoffrey, Buzz, the Aldine Trust, and/or a limited-liability company and Geoffrey, notwithstanding all of his hard work and efforts, receives nothing. In sum, approximately $3 million has been deposited into the trust thus far stemming from business deals Geoffrey conceived, developed and managed.

28.     In light of the foregoing, it might appear that Geoffrey is either the world's worst businessman or an incredible philanthropist, the object of whose beneficence is his millionaire-father's trust fund. But Geoffrey is neither a failed businessman nor a latter-day Andrew Carnegie for rich relatives. Rather, Geoffrey and his father are merely unartful money launderers. The reality here is that the above-chronicled transactions involving Geoffrey, Buzz, and the Aldine Trust are all a sham designed to divest the marital estate of millions of dollars. The funds which have been given to the trust from these projects is, in reality, Geoffrey's money (and therefore the marital estate's money). Buzz and his alter-ego, the Aldine Trust, are merely holding Geoffrey's money until these divorce proceedings are over. At which point, through some other artifice or sham transaction (or transactions), the money will flow back to a divorced Geoffrey. The victims of this sham are Myra and the parties' children, and probably the Internal Revenue Service. And while this is transpiring, Geoffrey has the *chutzpah* to come before the divorce court and claim that he has no money to support his family. In fact, he seeks to pull his children out of their school, the Latin School in Chicago.

29.     In Illinois, the elements of common-law fraud are: (1) a false statement of material fact; (2) the party making statement knew it or believed it to be untrue; (3) the recipient had a right to rely on it and did so; (4) the statement was made for the purpose of inducing recipient to act; and (5) an injury of the recipient by his reliance on the statement. *In re Marriage of Ealy*, 269 Ill. App. 3d 971, 647 N.E.2d 307 (1995).

30.     The aforementioned transfers of money by Geoffrey or entities controlled by him to Buzz and/or the Aldine Trust are a sham, false, and made in bad faith. Buzz and his alter-ego, the

Aldine Trust, are acting in concert with and as the agents of Geoffrey in this sham and common scheme to deprive Myra of her fair share of the marital estate, as well as to support of herself and the minor children.

31.     The initial representation to Myra, on or about Spring 2004, by Geoffrey, a successful real-estate developer, that he would sell Mohawk for their mutual benefit by including it in and along with his other real-estate development projects was false. Geoffrey's true intent was to divest the marital estate of the asset and consequently Myra of her equitable share of the same.

32.     As a result of Geoffrey's promise and at his urging, Myra reasonably relied upon the promise of her husband to sell the Mohawk residence for their mutual benefit and accordingly quit-claimed her interest in the realty to 2002 North Mohawk, LLC, on or about July 2004. Thereafter, without Myra's knowledge and in breach of his promise to her, Geoffrey arranged for 99% of this LLC to be owned by the Aldine Trust. Geoffrey retained a 1% interest in the LLC in the name of the Brixton Group, Geoffrey's real-estate development corporation which he claims to have formed prior to the parties' marriage. Put simply, he wrongfully removed the asset from the marital estate.

33.     Myra had a right to rely upon the Geoffrey's representations that he would sell the Mohawk residence for their mutual benefit as he is her husband, whom she loved and trusted. Further, a husband and wife stand in a fiduciary relationship with one another. Accordingly, her reliance upon Geoffrey was reasonable.

34.     As a result of Geoffrey's deception, Myra has been injured as the Mohawk residence, a valuable asset of the marital estate, has been removed from the marital estate and her marital claims against the same defeated. Further, the divorce court has been deprived of true and correct

information and thus cheated out of its ability to do substantial justice between the parties in their

divorce. Likewise, Geoffrey's alter-ego, 2002 North Mohawk, LLC is responsible and liable for

Geoffrey's actions and the consequences thereof in furtherance of this common scheme.

35.    Buzz, as a co-conspirator and facilitator of the common scheme to divest the marital

estate of the Mohawk property is responsible and liable for Geoffrey's actions and the consequences

thereof in furtherance of this scheme.

36.    The Aldine Trust, acting through it sole beneficiary and attorney, Buzz, is a co-

conspirator and facilitator of the scheme to divest the marital estate of the Mohawk property is

responsible and liable for Geoffrey's actions and the consequences thereof in furtherance of this

scheme.

37.    In light of the foregoing, the Defendants have defrauded Myra.

38.    The aforementioned conduct of all Defendants was wilful and wanton. Accordingly,

punitive or exemplary damages should be awarded to Myra.

39.    Myra demands trial by a jury of 12 of her peers on this count.

**WHEREFORE,** your Plaintiff, Myra R. Ruttenberg, prays this Honorable Court as follows:

A.    That the Court void, rescind, or otherwise invalidate the assignment of Myra's
       interest in 2002 North Mohawk, Chicago, Illinois to 2002 North Mohawk, LLC;

B.    Alternatively, that the Court, after a jury trial, enter a monetary judgment for the fair-
       market value of the property interest conveyed by Myra against the Defendants,
       jointly and severally;

C.    That the Court, after a jury trial, enter a judgment for punitive damages against
       Geoffrey individually in the amount of five million dollars ($5,000,000);

D.    That the Court, after a jury trial, enter a judgment for punitive damages against Buzz
       individually in the amount of five million dollars ($5,000,000);

E.   That the Court, after a jury trial, enter a judgment for punitive damages against the Aldine Trust individually in the amount of five million dollars ($5,000,000);

F.   That the Court, after a jury trial, enter a judgment for punitive damages against 2002 North Mohawk, LLC individually in the amount of five million dollars ($5,000,000);

G   That the Defendants be, jointly and severally, required to personally pay for the attorney fees and costs of this action; and

H.   For such other and further relief as the Court deems just and as equity may require.

## COUNT II — COMMON-LAW CIVIL CONSPIRACY

1-39.   Myra adopts and realleges paragraphs one through 39 of Count I above as though fully set forth herein.

40.   The elements of a civil conspiracy claim are: (1) an agreement between two or more persons to participate in an unlawful act or a lawful act in an unlawful manner; (2) an injury caused by the defendant; and (3) an overt act committed in furtherance of the common scheme. *See Pawlikowski v. Toyota Motor Credit Corp.*, 309 Ill. App. 3d 550, 564 (1999).

41.   As outlined *supra*, Geoffrey, Buzz, the Aldine Trust, and 2002 North Mohawk, LLC agreed to participate in their common scheme to defraud Myra and the marital estate of the Mohawk Street property and the funds transferred to the Aldine Trust.

42.   As a consequence of Geoffrey, Buzz, the Aldine Trust, and 2002 North Mohawk, LLC's agreement to participate in their common scheme to defraud Myra and the marital estate of the Mohawk Street property and the funds transferred to the Aldine Trust, the marital estate and consequently Myra have been wrongfully divested of these same assets.

43.   The false representations made by Geoffrey to Myra regarding the Mohawk Street property constitute overt acts committed in furtherance of all Defendants' common scheme to

defraud Myra and the marital estate of the Mohawk property and the funds transferred to the Aldine Trust. Further, all of the actions by Buzz, detailed above, constitute overt further acts committed in furtherance of this common scheme by all the Defendants to defraud Myra and the marital estate of the Mohawk property and the funds transferred to the Aldine Trust.

44.    The aforementioned conduct of all Defendants was wilful and wanton. Accordingly, punitive or exemplary damages should be awarded to Myra.

45.    Myra demands trial by a jury of 12 of her peers on this count.

**WHEREFORE**, your Plaintiff, Myra R. Ruttenberg, prays this Honorable Court as follows:

A.    That the Court, after a jury trial, enter a judgment against the Defendants jointly and severally for an amount of compensatory damages in excess of the jurisdictional requirements for a case brought at law;

B.    That the Court, after a jury trial, enter a judgment for punitive damages against Geoffrey individually in the amount of five million dollars ($5,000,000);

C.    That the Court, after a jury trial, enter a judgment for punitive damages against Buzz individually in the amount of five million dollars ($5,000,000);

D.    That the Court, after a jury trial, enter a judgment for punitive damages against 2002 North Mohawk, LLC individually in the amount of five million dollars ($5,000,000);

E.    That the Court award to all attorney fees and costs incurred in the investigation, preparation and presentation of this complaint against the Defendants; and

F.    For such other and further relief as the Court deems just and as equity may require.

## COUNT III — CIVIL RICO

1-45.    Myra adopts and realleges paragraphs 1 through 45 of Count II above as though fully set forth herein.

46.     This count is brought pursuant to the provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*. Jurisdiction is properly vested in this Court as State courts have concurrent jurisdiction with the Federal district courts over civil RICO claims. *See Tafflin v. Levitt*, 493 U.S. 455, 110 S.Ct. 792, 107 L.Ed.2d 887 (1990). Venue is proper in the Circuit Court of Cook County, Illinois in that the plaintiff and all the defendants reside in Cook County and this is the county in which a substantial part of the events or omissions giving rise to the claim occurred.

47.     As explained *supra*, Myra and the marital estate suffered an economic and/or property loss as a direct result of the Defendants' scheme to defraud Myra and the marital estate of Mohawk property and the money transferred to the Aldine Trust. Thus, under civil RICO, Myra has shown an injury to her property as a result of the Defendants' actions.

48.     The economic injuries Myra suffered arose while Geoffrey and Buzz acted as part of an "enterprise" within the meaning of RICO. Here, as discussed *supra*, the enterprise consisted of the association between Geoffrey and Buzz created solely to further their fraudulent, illegitimate and unlawful scheme of hiding assets to minimize the amount of property Myra ultimately receives in her and Geoffrey's divorce. This enterprise engaged in and affected interstate commerce by virtue of the interstate nature of the real-estate business and its use of Federally-regulated financial institutions engaged in interstate commerce. Further, these real-estate projects use goods that have been shipped in interstate commerce. This enterprise, as explained above, was used by Geoffrey and Buzz to gain control over marital assets hidden from Myra.

–12–

49.    A "racketeering activity" under RICO includes any act which is indictable under section 1341 (relating to mail fraud) and section 1343 (relating to wire fraud) of title 18 of the United States Code.

50.    18 U.S.C. § 1341 provides as follows:

> "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1341.

51.    As noted above, as part of their scheme to swindle Myra of her rightful share of the marital estate, on information and belief, both Geoffrey and Buzz have caused to be sent correspondence or other documents to be sent or delivered by the United States Postal Service. This course of conduct constitutes multiple violations of 18 U.S.C. § 1341 by both men.

52.    18 U.S.C. § 1343 provides as follows:

> "Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of

–13–

false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both." 18 U.S.C. § 1343.

53.     As part of their scheme to swindle Myra of her rightful share of the marital estate, on information and belief, both Geoffrey and Buzz have, on multiple occasions engaged in telephonic wire communications with one another, as well as with third parties for the for the purpose of executing such scheme. Geoffrey has on multiple occasions both before and since the execution of the quit claim deed by Myra, engaged in telephonic wire communications with Myra wherein he falsely stated that he would sell Mohawk for their mutual benefit by including it in and along with his other real-estate development projects. This course of conduct constitutes multiple violations of 18 U.S.C. § 1343 by both Geoffrey and Buzz.

54.     These mailings and use of the telephone described in paragraphs 51 and 53 above constitute a "pattern of racketeering activity" by Geoffrey and Buzz as defined in 18 U.S.C. § 1961.

55.     By reasons of the foregoing facts described above, Geoffrey and Buzz violated 18 U.S.C. 1962(b).

56.     By reasons of the foregoing facts described above, Geoffrey and Buzz violated 18 U.S.C. 1962(d).

57.     As explained *supra*, the Aldine Trust and 2002 North Mohawk, LLC are liable for Geoffrey and Buzz's actions and consequential violation of RICO herein.

58.     Myra demands trial by a jury of 12 of her peers on this count.

**WHEREFORE**, your Plaintiff, Myra R. Ruttenberg, prays this Honorable Court as follows:

A.    That, after jury trial, she be granted a judgment against all Defendants, jointly and severally, in the amount of all damages suffered by her as a result of their wrongful acts;

B.    That she be granted judgment against all Defendants, jointly and severally, for **treble** the damages she has suffered by reasons of injury to her property rights as a result of their violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*;

C.    That she be granted judgment against all Defendants, jointly and severally, for all costs of this action, including reasonable attorney fees; and

D.    For such other and further relief as the Court deems just and as equity may require.

## COUNT IV—FRAUDULENT CONVEYANCE

1-58.    Myra adopts and realleges paragraphs 1 through 58 of Count III above as though fully set forth herein.

59.    At all times relevant hereto, the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2008)) was in effect.

60.    Myra is a creditor within the meaning of subsection 2(d) of the Uniform Fraudulent Transfer Act (740 ILCS 160/2(d) (West 2008)). Indeed, once a divorce petition has been filed, under subsection 503(e) of the Illinois Marriage and Dissolution of Marriage Act, "[e]ach spouse has an species of common ownership in the marital property which vests at the time dissolution proceedings are commenced." 750 ILCS 5/503(e) (West 2008).

61.    Accordingly, Myra had a vested interest in the Mohawk Street property and the funds wrongfully transferred to the Aldine Trust upon the filing of Geoffrey's dissolution petition.

62.    The transfer of the properties chronicled above was done by the Defendants with an actual intent to hinder, delay, or defraud Myra's marital interest in or claim to them.

63.    Geoffrey is a "debtor" within the meaning of subsection 2(f) of Uniform Fraudulent Transfer Act (740 ILCS 160/2(f) (West 2008)) in that he is subject to the marital interest or claim of Myra. *See* 750 ILCS 5/503(e) (West 2008).

64.    Buzz, a relative of Geoffrey, is an "insider" within the meaning of subsection 2(g) of the Uniform Fraudulent Transfer Act (740 ILCS 160/2(g) (West 2008)). Geoffrey is an individual or natural person. Further, all of Geoffrey's co-Defendants are partners and associates of him various real-estate ventures described above.

65.    In light of the foregoing, the transfer of the properties detailed above from Geoffrey to Buzz, the Aldine Trust, and the LLC constituted a fraudulent transfer or transfers within the meaning of the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2008)). Accordingly, Myra has a claim against both all Defendants under the Uniform Fraudulent Transfer Act (740 ILCS 160/1 *et seq.* (West 2008)).

66.    Myra demands trial by a jury of 12 of her peers on this count.

**WHEREFORE**, your Plaintiff, Myra R. Ruttenberg, prays this Honorable Court as follows:

A.    That the Court enter void, rescind, or otherwise invalidate the assignment of Myra's interest in 2002 North Mohawk, Chicago, Illinois to 2002 North Mohawk, LLC;

B.    Alternatively, that the Court enter a monetary judgment for the fair-market value of the property interest conveyed by Myra against the Defendants, jointly and severally;

C.    That the Court appoint a receiver to take charge of said transferred properties; and

D.     For any other relief the circumstances and equity may require and the Court deems just.

## COUNT V—UNJUST ENRICHMENT

1-66.     Myra adopts and realleges paragraphs 1 through 66 of Count IV above as though fully set forth herein.

67.     In an action in equity for unjust enrichment, a complaint on which recovery may be based need only allege that there has been unjust retention of a benefit by one party to the detriment of another against the fundamental principles of justice and equity.

68.     The transfer of the properties detailed above from Geoffrey to Buzz, the Aldine Trust, and the LLC constituted an unjust retention of a benefit Geoffrey to Buzz, the Aldine Trust, and the LLC to the detriment of Myra.  Such unjust retention violates the fundamental principles of justice and equity.

**WHEREFORE**, your Plaintiff, Myra R. Ruttenberg, prays this Honorable Court as follows:

A.     That the Court enters a judgment against the Defendants jointly and severally for an amount of such compensatory damages commensurate with the properties improperly retained by the Defendants; and

B.     For such other and further relief as the Court deems just and as equity may require.

## COUNT VI—CONSTRUCTIVE TRUST

1-68.     Myra adopts and realleges paragraphs 1 through 68 of Count V above as though fully set forth herein.

68.     Here an identifiable property or *res* exists in the form of the detailed above which were transferred from Geoffrey to Buzz, the Aldine Trust, and the LLC.

−17−

69.    As detailed above, Defendant's possession and/or control of such properties is a result of unjust enrichment or bad-faith dealings.

70.    Consequently, a constructive trust in favor of and for the benefit of Myra should be imposed upon the Defendants.

**WHEREFORE**, your Plaintiff, Myra R. Ruttenberg, prays this Honorable Court as follows:

A.    That the Court enter an order finding that the Defendants are the constructive trustees of said wrongfully transferred properties for the benefit of Myra;

B.    That the Court enter an order requiring the Defendants to turn over said assets to the control of the Court; and

C.    For such other and further relief as the Court deems just and as equity may require.

Respectfully submitted,

MYRA R. RUTTENBERG

By: _____

DAVID I. GRUND, One of her attorneys

Grund & Leavitt, P.C.
812 North Dearborn Street
Chicago, Illinois  60610-3317
Telephone: (312) 640-0500

## **VERIFICATION**

Under penalties as provided by law pursuant to section 1-109 of the Code of Civil Procedure (735 ILCS 5/1-109 (West 2008)), the undersigned certifies that the statements set forth herein are true and correct, except as to matters therein stated to be on information and belief, and as to such matters, the undersigned certifies as aforesaid that she verily believes the same to be true.

Myra R. Ruttenberg

Grund & Leavitt, P.C.
812 North Dearborn Street
Chicago, Illinois  60610-3317
Telephone: (312) 640-0500

FAIRBANKS, 600

Ruttenberg/Meyer production of documents pursuant to Subpoena for Deposition dated June 24th 2008 in Case no. 08 D 319 in Circuit Court of Cook County, Illinois

(10 of 16)



600 FAIRBANKS COURT LLC
LIMITED LIABILITY COMPANY AGREEMENT

THIS LIMITED LIABILITY COMPANY AGREEMENT ("Agreement") is made as of the
___ day of _____, 2004, among those persons who have executed, or who hereafter execute,
this Agreement. In consideration of the mutual covenants and agreements hereinafter set forth, the
parties, desiring to continue the limited liability company heretofore formed pursuant to the
Delaware Limited Liability Company Act and upon the terms and conditions hereinafter set forth,
hereby agree as follows:

## ARTICLE I

## DEFINITIONS

The following terms used in this Limited Liability Company Agreement shall have the following
meanings:

     (a)    "Act" shall mean the Delaware Limited Liability Company Act, as amended.

     (b)    "Affiliate" means, with respect to any Member, an Person or Entity: (i) which
owns more than 25% of the voting interests in the Member; or (ii) in which the Member
owns more than 25% of the voting interests; or (iii) in which more than 25% of the voting
interests are owned by a Person who has a relationship with the Member described in clause
(i) or (ii) above.

     (c)    "Air Rights" shall mean that parcel of real estate comprised of the air rights
above the property commonly known as 610 North Fairbanks Court, Chicago, Illinois and
legally described on Exhibit "B" attached hereto which shall be contributed by Chicago
Development II LLC to the Company pursuant to the terms and conditions of a separate
Contribution Agreement dated _____, 2004 between and among the Class B Members
and the Class C Members.

     (d)    "Approved Development Budget" shall mean a Development Budget or
modification to a Development Budget, as approved by the Class C Members holding at least
seventy-five percent (75%) of the Participating Percentages of all Class C Members.

     (e)    "Capital Account" as of any given date shall mean the account maintained for
each Member pursuant to Article VIII.

     (f)    "Capital Contribution" shall mean any contribution to the capital of the
Company in cash or property by a Member whenever made. "Initial Capital Contribution"
shall mean the initial contribution to the capital of the Company pursuant to this Limited
Liability Company Agreement.

1

(g)    "Capital Interest" shall mean as of any given date the proportion that a Member's positive Capital Account bears to the aggregate positive Capital Accounts of all Members whose Capital Accounts have positive balances as of such date.

(h)    "Certificate of Formation" shall mean the Certificate of Formation of the Company as filed with the Secretary of State of Delaware, as amended from time to time.

(i)    "Class A Member" shall mean each Member identified as a Class A Member on Exhibit A attached hereto.

(j)    "Class A Return" shall mean an amount equal to a forty percent (40%) cumulative, non-compounded annual return on each Class A Member's Unrecovered Capital.

(k)    "Class B Member" shall mean each Member identified as a Class B Member on Exhibit A attached hereto.

(l)    "Class C Member" shall mean each Member identified as a Class C Member on Exhibit A attached hereto.

(m)    "Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

(n)    "Company" shall refer to 600 FAIRBANKS COURT LLC.

(o)    "Company Property" or "Property" shall mean all properties, assets and rights of any type owned by the Partnership.

(p)    "Deficit Capital Account" shall mean with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the taxable year, after giving effect to the following adjustments:

    (i)    credit to such Capital Account any amount which such Member is obligated to restore under Section 1.704-1(b)(2)(ii)(c) of the Treasury Regulations, as well as any addition thereto pursuant to the next to last sentence of Sections 1.704-2(g)(1) and (i)(5) of the Treasury Regulations, after taking into account thereunder any changes during such year in partnership minimum gain (as determined in accordance with Section 1.704-2(d) of the Treasury Regulations) and in the minimum gain attributable to any partner for nonrecourse debt (as determined under Section 1.704-2(i)(3) of the Treasury Regulations); and

    (ii)    debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), (5) and (6) of the Treasury Regulations.

This definition of Deficit Capital Account is intended to comply with the provision of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be interpreted consistently with those provisions.

(q)    "Development Budget" shall mean a Development Budget or modification to an Approved Development Budget pertaining to any project to be developed both on the property commonly known as 252 East Ohio Street, Chicago, Illinois and on the Air Rights.

(r)    "Distributable Cash" shall mean all cash, revenues and funds received by the Company from Company operations, less the sum of the following to the extent paid or set aside by the Company: (i) all principal and interest payments on indebtedness of the Company and all other sums paid to lenders; (ii) all cash expenditures incurred in the normal operation of the Company's business; (iii) reserves; and (iv) such amounts required to be retained by any lender of the Company.

(s)    "Economic Interest" shall mean a Member's or Economic Interest Owner's share of one or more of the Company's Net Profits, Net Losses and distributions of the Company's assets pursuant to this Limited Liability Company Agreement and the Act, but shall not include any right to participate in the management or affairs of the Company, including, the right to vote on, consent to or otherwise participate in any decision of the Members or Manager.

(t)    "Economic Interest Owner" shall mean the owner of an Economic Interest who is not a Member.

(u)    "Entity" shall mean any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative, association, foreign trust or foreign business organization.

(v)    "Family" means, with respect to a Member, the Member's spouse, lineal ancestors or descendants by birth or adoption, siblings, and trusts for the exclusive benefit of a Member or any of the foregoing individuals, and with respect to a corporation, trust or other entity, the Member's shareholders, partners, executive officers, directors, members, managers, trustees, beneficiaries or Affiliates.

(w)    "Fiscal Year" shall mean the Company's fiscal year as determined by the Manager.

(x)    "Gifting Member" shall mean any Member or Economic Interest Owner who gifts, bequeaths or otherwise transfers for no consideration (by operation of law or otherwise, except with respect to bankruptcy) all or any part of its Membership Interest or Economic Interest.

3

(y)  "Limited Liability Company Agreement" shall mean this Limited Liability Company Agreement as originally executed and as amended from time to time.

(z)  "Managers" shall mean one or more managers who have the authority to manage the Company in accordance with the provisions of this Limited Liability Company Agreement. References to the Manager in the singular or as him, her, it, itself, or other like references shall also, where the context so requires, be deemed to include the plural or the masculine or feminine reference, as the case may be.

(aa)  "Member" shall mean each of the parties who executes a counterpart of this Limited Liability Company Agreement as a Member and each of the parties who may hereafter become Members. To the extent a Manager has purchased a Membership Interest in the Company, he will have all the rights of a Member with respect to such Membership Interest, and the term "Member" as used herein shall include a Manager to the extent he has purchased such Membership Interest in the Company. If a Person is a Member immediately prior to the purchase or other acquisition by such Person of an Economic Interest, such Person shall have all the rights of a Member with respect to such purchased or otherwise acquired Membership Interest or Economic Interest, as the case may be.

(bb)  "Membership Interest" shall mean a Member's entire interest in the Company including such Member's Economic Interest and the right to participate in the management of the business and affairs of the Company, including the right to vote on, consent to, or otherwise participate in any decision or action of or by the Members granted pursuant to this Limited Liability Company Agreement and the Act.

(cc)  "Net Profits" and "Net Losses" shall mean the net amount of all income, and gain, loss, and deductions of the Company in the aggregate or separately stated, as appropriate, determined in accordance with generally accepted accounting principles or such other method of accounting deemed appropriate by the Manager at the close of each fiscal year on the Company's tax return filed for federal income tax purposes.

(dd)  "Participating Percentage" shall mean the percentage of each Member as set forth on the attached Exhibit A.

(ee)  "Persons" shall mean any individual or Entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such "Person" where the context so permits.

(ff)  "Reserves" shall mean funds set aside or amounts allocated to reserves which shall be maintained in amounts deemed sufficient by the Managers for working capital and to pay taxes, insurance, debt service or other costs or expenses incident to the ownership or operation of the Company's business.

4

(gg)  "Sale Proceeds" shall mean the proceeds to the Company from the sale of Company Property, including interest on any deferred or installment payments, less the sum of: (a) customary brokerage commissions and other expenses incurred by the Company in connection with such sale, and (b) any portion of such proceeds applied by the Manager toward the payment of indebtedness secured by a lien on or relating to the property sold.

(hh)  "Schatz" shall mean Chicago Development II LLC, an Illinois limited liability company, and Chicago Development III LLC, or any entity to which the Membership Interest of Chicago Development II LLC and /or Chicago Development III LLC is transferred.

(ii)  "Selling Member" shall mean any Member or Economic Interest Owner which sells, assigns, pledges, hypothecates or otherwise transfers for consideration all or any portion of its Membership Interest or Economic Interest.

(jj)  "Transferring Member" shall collectively mean a Selling Member and a Gifting Member.

(kk)  "Treasury Regulations" shall include proposed, temporary and final regulations promulgated under the Code.

(ll)  "Unrecovered Capital" means the aggregate amount of Capital Contributions made by a Member or by his predecessor in interest, as reduced (but not below zero) by the aggregate amount of distributions of Distributable Cash previously made to such Member, or to his predecessor in interest.

## ARTICLE II

## FORMATION OF COMPANY

2.1  Formation.  The Company has been organized as a Delaware Limited Liability Company by executing and delivering a Certificate of Formation to the Delaware Secretary of State in accordance with and pursuant to the Act. The rights and liabilities of the Members shall be as provided in the Act, except as otherwise expressly provided herein.

2.2  Name.  The name of the Company is "600 FAIRBANKS COURT LLC".

2.3  Principal Place of Business.  The principal office of the Company shall be located in the State of Illinois at 1246 West George Street, Chicago, Illinois 60657. The Company may locate its places of business and registered office at any other place or places as the Manager may from time to time deem advisable.

2.4  Registered Office and Registered Agent.  The registered office of the Company in the State of Delaware shall be located at Corporation Service Company, 2711 Centerville Road, Suite

400, Wilmington, Delaware 19808. The registered office of the Company in the State of Illinois shall be 1246 West George Street, Chicago, Illinois 60657.

2.5    Term. The term of the Company shall be perpetual, unless the Company is earlier dissolved in accordance with either the provisions of this Limited Liability Company Agreement or the Act.

## ARTICLE III

## BUSINESS OF COMPANY

The business of the Company shall be:

(a)    To accomplish any lawful business whatsoever, or which shall at any time appear conductive to or expedient for the protection or benefit of the Company and its assets.

(b)    To exercise all other powers necessary to or reasonably connected with the Company's business which may be legally exercised under the Act.

## ARTICLE IV

## NAMES AND ADDRESSES OF MEMBERS

The names and addresses of the Members are as set forth on the attached signature pages

## ARTICLE V

## RIGHTS AND DUTIES OF MANAGERS

5.1    Management. The business and affairs of the Company shall be managed by its Manager. Subject to Section 5.4, the Manager shall direct, manage and control the business of the Company. Except for situations in which the approval of the Members is expressly required by this Limited Liability Company Agreement or by nonwaivable provisions of the Act, the Manager shall have full and complete authority, power and discretion to manage and control the business, affairs and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business. At any time when there is more than one Manager, any Manager may take any action permitted to be taken by the Managers, unless the approval of a different percentage of the Managers is expressly required pursuant to this Limited Liability Company Agreement or the Act.

5.2    Number, Tenure and Qualifications. The Company shall initially have one (1) Manager, which shall be The Brixton Group, Ltd. The number of Managers of the Company shall be fixed from time to time by the affirmative vote of the Class C Members holding at least seventy-five percent (75%) of all of the Class C Participating Percentages, but in no instance shall there be less

6

than one Manager. A Manager shall hold office until its resignation, removal, death or dissolution. Managers need not be Members of the Company.

5.3    Certain Powers of Managers. Without limiting the generality of Section 5.1 or Section 5.4, the Manager shall have power and authority, on behalf of the Company, to do each of the following; provided, however, that any action under items (a), (b), (c), (d), (e), (f) or (g) below shall require the affirmative approval or vote of a majority of the Managers, if the Company then has more than one Manager:

(a)    To acquire property from any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member, if the amount of such property is $25,000.00 or less; notwithstanding the foregoing, however, the Manager shall have power and authority to acquire property from a Person directly or indirectly affiliated or connected with any Manager or Member provided the amount of such property is $25,000.00 or less of an amount as set forth in a previously Approved Development Budget;

(b)    To enter into, or to modify or amend, any service contracts with any Person as the Manager may determine, whether or not such Person is directly or indirectly affiliated or connected with any Manager or Member, if the amount of such service contract is $25,000.00 or less; notwithstanding the foregoing, however, the Manager shall have power and authority to enter into, or to modify or amend, any service contracts with any Person directly or indirectly affiliated or connected with any Manager or Member provided the amount of such service contract is $25,000.00 or less of an amount as set forth in a previously Approved Development Budget;

(c)    To sell condominium units which are the property Company for and on behalf of the Company on such terms and conditions deemed satisfactory to the Manager, and to receive and disburse proceeds from the sale of the Company's condominium unit property;

(d)    To change the sale price of condominium units which are the property of the Company provided the proposed sales price change is no greater than nine percent (9%) of the then current sales price as approved by the Class C Members;

(e)To sell property of the Company to any Person as the Manager may determine, whether or not such person is directly or indirectly affiliated or connected with any Managers or Members, for and on behalf of the Company on such terms and conditions deemed satisfactory to the Manager if the amount of such property is $25,000.00 or less; notwithstanding the foregoing, however, the Manager shall have power and authority to sell property of the Company to a Person directly or indirectly affiliated or connected with any Manager or Member provided the sale price of such property is $25,000.00 or less of an amount as set forth in a previously Approved Development Budget;

7

(f) To receive and disburse proceeds from the sale of the Company's property which sales are permitted as set forth in Section 5.3(d) above;

(g)    To purchase liability and other insurance to protect the Company's property and business;

(h)    To hold and own Company real and personal properties in the name of the Company;

(i)    To maintain, operate, improve, develop, lease and otherwise use real property owned by the Company or interests therein on behalf of the Company;

(j)    To invest Company funds in time deposits, short-term governmental obligations, commercial paper or other investments;

(k)    To execute on behalf of the Company all instruments and documents, including, without limitation, checks; drafts; notes and other negotiable instruments; mortgages or deeds of trust; security agreements; financing statements; documents providing for the acquisition, mortgage or disposition of the Company's property; assignments; bills of sale; leases; and any other instruments or documents necessary to the business of the Company, subject to the provisions of Section 5.4;

(l)    To employ accountants, legal counsel, managing agents or other experts to perform services for the Company;

(m)    To enter into any and all other agreements on behalf of the Company, in such forms as the Manager may approve, subject to the provisions of Section 5.4; and

(n)    To do and perform all other acts as may be necessary or appropriate to the conduct of the Company's business.

Unless authorized to do so by this Limited Liability Company Agreement or by the Manager of the Company, no attorney-in-fact, employee or other agent of the Company shall have any power or authority to bind the Company in any way, to pledge its credit or to render it liable for any purpose. No Member shall have any power or authority to bind the Company unless the Member has been authorized by the Managers to act as an agent of the Company in accordance with the previous sentence.

5.4    Limitation of Authority of Managers. Notwithstanding any other provision herein to the contrary, an affirmative vote of the Class C Members holding at least seventy-five percent (75%) of the Participating Percentages of all Class C Members shall be required before any Manager shall:

(a)    Acquire property (i) from any Person as the Manager may determine, if such Person is not directly or indirectly affiliated or connected with any Manager or Member, if

8

the amount of such property is more than $25,000.00; or (ii) from any Person as the Manager may determine, if such Person is directly or indirectly affiliated or connected with any Manager or Member and the amount of such property is more than $25,000.00 of an amount as set forth in a previously Approved Development Budget;

(b) Sell property of Company for and on behalf of the Company on such terms and conditions deemed satisfactory to the Class C Members (i) to a Person that is not directly or indirectly affiliated or connected with any Manager or Member, if the amount of such property is more than $25,000.00; or (ii) to a Person that is directly or indirectly affiliated or connected with any Manager or Member if the sale price of such property is more than $25,000.00 of an amount as set forth in a previously Approved Development Budget;

(c) Receive and disburse proceeds from the sale of the Company's property which sales require an affirmative vote of the Class C Members holding at least seventy-five percent (75%) of the Participating Percentages of all Class C Members as required in Section 5.4 (b) above;

(d)    Enter into, or modify or amend, any service contracts (i) with any Person as the Manager may determine, if such Person is not directly or indirectly affiliated or connected with any Manager or Member, if the amount of such service contract is more than $25,000.00; or (ii) with any Person as the Manager may determine, if such Person is directly or indirectly affiliated or connected with any Manager or Member provided such service contracts or modifications or amendments are more than $25,000.00 of an amount as set forth in a previously Approved Development Budget;

(e)    To change the sale price of condominium units which are the property of the Company provided the proposed sales price change is greater than nine percent (9%) of the then current sales price as approved by the Class C Members;

(f) Sell, exchange, or otherwise dispose of, finance or refinance all, or substantially all of the assets of the Company as part of a single transaction or plan;

(g) Borrow money for the Company from banks, other lending institutions, the Managers, Members, or Affiliates of the Managers or Members or refinance any debts or obligations of the Company;

(h) Hypothecate, encumber and grant any security interest in any of the assets of the Company to secure repayment of borrowed sums;

(i) Admit a new Member to the Company or redeem any Member's interest in the Company;

(j) Enter into or settle any litigation, arbitration or other similar proceeding involving the Company;

9

(k) Voluntarily dissolve the Company;

(l) Modify, or make distributions, in any manner other than pursuant to the provisions of Article IX regarding distributions to the Members;

(m) Request additional Capital Contributions from any Member;

(n) Materially modify the architectural/engineering design of a Company project, including modifications of plans and specifications for a Company project; or

(o) To employ or change the employment of a general contractor for a Company project.

(p) Within ten (10) days after submission by the Manager to the Class C Members, to approve a Development Budget for any project to be developed both on the property commonly known as 252 East Ohio Street, Chicago, Illinois and on the Air Rights.

5.5   Liability for Certain Acts.   A Manager shall perform its duties as Manager in good faith, in a manner it reasonably believes to be in the best interests of the Company, and with such care as an ordinarily prudent person in a like position would use under similar circumstances. A Manager shall not be liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless the loss or damage shall have been the result of fraud, deceit, gross negligence, willful misconduct or a wrongful taking by the Manager.

5.6   Managers Have No Exclusive Duty to Company.   A Manager shall not be required to manage the Company as its sole and exclusive function and it may have other business interests and engage in activities in addition to those relating to the Company. Neither the Company nor any Member shall have any right, by virtue of this Limited Liability Company Agreement, to share or participate in such other investments or activities of the Manager or to the income or proceeds derived therefrom.

5.7   Bank Accounts.   The Manager may from time to time open bank accounts in the name of the Company, and the officers of the Manager and the officers of the Company shall be the sole signatory thereon, unless Members owning a majority of the Participating Percentages determine otherwise.

5.8   Indemnity of the Manager, Employees and Other Agents.   The Company shall, to the maximum extent permitted under Section 15-10 of the Act, both indemnify the Managers and their respective officers, directors, employees and agents and make advances for expenses. The Company shall indemnify its employees and other agents who are not Managers to the fullest extent permitted by law, provided that such indemnification is approved by Members owning a majority of the Participating Percentages.

10

5.9    <u>Resignation.</u>  A Manager of the Company may resign at any time by giving written notice to the Members of the Company.  The resignation of any Manager shall take effect upon receipt of notice thereof or at such later date specified in such notice; and, unless otherwise specified therein, the acceptance of such resignation shall not be necessary to make it effective.  The resignation of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.10    <u>Removal.</u>  At a meeting called expressly for that purpose, all or any lesser number of Managers may be removed at any time, with or without cause, by the affirmative vote of Class C Members holding at least seventy-five percent (75%) of all of the Class C Participating Percentages. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute a withdrawal of a Member.

5.11    <u>Vacancies.</u>  Any vacancy occurring for any reason in the number of Managers of the Company may be filled by the affirmative vote of Class C Members holding at least seventy-five percent (75%) of all of the Class C Participating Percentages. Any Manager's position to be filled by reason of an increase in the number of Managers shall be filled by an election at a special meeting of the Class C Members called for that purpose and by the affirmative vote of Class C Members' holding at least seventy-five percent (75%) of all of the Class C Participating Percentages.  A Manager chosen to fill a position resulting from an increase in the number of Managers shall hold office until such Manager's death, dissolution, resignation or removal.

5.12    <u>Salaries.</u>  The salaries and other compensation of the Managers shall be fixed from time to time by an affirmative vote of Class C Members holding at least seventy-five percent (75%) of all of the Class C Participating Percentages and no Manager shall be prevented from receiving such salary because he or it is also a Member of the Company.

ARTICLE VI

<u>RIGHTS AND OBLIGATIONS OF MEMBERS</u>

6.1    <u>Limitation of Liability.</u>  Each Member's liability shall be limited as set forth in this Limited Liability Company Agreement, the Act and other applicable law.

6.2    <u>Company Debt Liability.</u>  A Member will not be personally liable for any debts or losses of the Company beyond his or its respective Capital Contribution, except as provided in Section 6.7 herein or as otherwise required by law.

6.3    <u>List of Members.</u>  Upon the written request of any Member, the Manager shall provide a list showing the names, addresses and Membership Interests and Economic Interests of all Members.

6.4    <u>Approval of Sale of All Assets.</u>  The Class C Members shall have the right, by the affirmative vote of Class C Members holding at least seventy-five percent (75%) of all of the Class C

11

Participating Percentages, to approve the sale, exchange or other disposition of all, or substantially all, of the Company's assets which is to occur as part of a single transaction or plan; provided, however, the Members shall not be required to approve the sale of the individual condominium units that may be offered for sale by the Company in the ordinary course of its business activities, the sale of such individual units shall be at the direction of the Manager.

6.5     Company Books.  The Manager shall maintain and preserve, during the term of the Company, all accounts, books, and other relevant Company documents.  Upon reasonable written request, each Member and Economic Interest Owner shall have the right, at a time during ordinary business hours as reasonably determined by the Managers, to inspect and copy at the requesting Member's or Economic Interest Owner's expense, the Company documents identified in Section 1-40 of the Act, and such other documents which the Managers, in their discretion, deem appropriate.

6.6     Priority and Return of Capital.  Except as may be expressly provided in Article IX, no Member or Economic Interest Owner shall have priority over any other Member or Economic Interest Owner, either as to the return of Capital Contributions or as to Net Profits, Net Losses or distributions; provided that this Section shall not apply to loans which a Member has made to the Company.

6.7     Liability of a Member to the Company.  A Member who receives a distribution or the return in whole or in part of his or its contribution is liable to the Company only to the extent provided by the Act.

## ARTICLE VII

## MEETINGS OF MEMBERS

7.1     Meetings.  Meetings of the Members, for any purpose or purposes, unless otherwise prescribed by statute, may be called for any reason by any Manager or by any Member or Members holding one-third (1/3) of the Participating Percentages.

7.2     Place of Meetings.  The Members may designate any place, either within or outside the State of Illinois, as the place of meeting for any meeting of the Members.  If no designation is made, the place of meeting shall be the principal place of business of the Company in the State of Illinois.

7.3     Notice of Meetings.  Except as provided in Section 7.9, written notice stating the place, day and hour of the meeting and the purpose or purposes for which the meeting is called shall be delivered not less than five (5) nor more than thirty (30) days before the date of the meeting, either personally or by mail, by or at the direction of the Managers or Member or Members calling the meeting, to each Member entitled to vote at such meeting.  If mailed, such notice shall be deemed to be delivered two calendar days after being deposited in the United States mail, addressed to the Member at its address as it appears on the books of the Company, with postage thereon prepaid.

7.4    Meeting of all Members. If all of the Members shall meet at any time and place, either within or outside of the State of Illinois, and consent to the holding of a meeting at such time and place, such meeting, shall be valid without call or notice, and at such meeting lawful action may be taken.

7.5    Record Date. For the purpose of determining Members entitled to notice of or to vote at any meeting of Members or any adjournment thereof, or Members entitled to receive payment of any distribution, or in order to make a determination of Members for any other purpose, the date on which notice of the meeting is mailed or the date on which the resolution declaring such distribution is adopted, as the case may be, shall be the record date for such determination of Members. When a determination of Members entitled to vote at any meeting of Members has been made as provided in this Section, such determination shall apply to any adjournment thereof.

7.6    Quorum. Members holding at least a majority of the Participating Percentages represented in person or by proxy, shall constitute a quorum at any meeting of Members.

7.7    Manner of Acting. If a quorum is present, the affirmative vote of Members holding a majority of the Participating Percentages shall be the act of the Members, unless the vote of a greater or lesser proportion or number is otherwise required by the Act, by the Certificate of Formation, or by the Limited Liability Company Agreement. Unless otherwise expressly provided herein or required under applicable law, only Members who have a Membership Interest may vote or consent upon any matter and their vote or consent, as the case may be, shall be counted in the determination of whether the matter was approved by the Members.

7.8    Proxies. At all meetings of Members, a Member may vote in person or by proxy executed in writing by the Member or by a duly authorized attorney-in-fact. Such proxy shall be filed with the Managers of the Company before or at the time of the meeting. No proxy shall be valid after eleven months from the date of its execution, unless otherwise provided in the proxy.

7.9    Action by Members Without a Meeting. Action required or permitted to be taken at a meeting of Members may be taken without a meeting if the action is evidenced by one or more written consents describing the action taken, signed by each Member entitled to vote and delivered to the Manager of the Company for inclusion in the minutes or for filing with the Company records. Action taken under this Section is effective when all Members entitled to vote have signed the consent, unless the consent specifies a different effective date

7.10    Waiver of Notice. When any notice is required to be given to any Member, a waiver thereof in writing signed by the person entitled to such notice, whether before, at, or after the time stated therein, shall be equivalent to the giving of such notice.

ARTICLE VIII

CONTRIBUTIONS TO THE COMPANY AND CAPITAL ACCOUNTS

13

8.1    <u>Members' Capital Contributions</u>. Each Member shall contribute such amount or such property as is set forth in Exhibit A hereto as his or its share of the Initial Capital Contribution.

8.2    <u>Additional Contributions</u>. It is anticipated that the Initial Capital Contributions, together with financing to be obtained by the Company, will be sufficient to fund the activities of the Company. However, if and when financing is not available to the Company and the Class C Members determine (in the exercise of reasonable business judgment and good faith) that funds are required for the operation of the business of the Company (the funds so determined as required being referred to as "Required Funds"), the Class C Members may, by notice to the Class C Members ("Cash Needs Notice"), call upon each Class C Member to contribute to the Company the percentage of the Required Funds equal to the Class C Member's Participating Percentage. Within fifteen (15) days after the giving of the Cash Needs Notice, each Class C Member shall contribute to the capital of the Company that Class C Member's Participating Percentage of the Required Funds ("Requested Amount").

If any Class C Member (a "Non-Contributing Class C Member") fails to contribute to the Company such Class C Member's Requested Amount within fifteen (15) days of having been given written notice (with a copy to the remaining Class C Members) to do so, any Class C Member(s) making the required contribution (the "Contributing Class C Member" shall be deemed to have made a loan ("Capital Loan") to the Non-Contributing Class C Member by advancing to the Company on behalf of the Non-Contributing Class C Member the Requested Amount due from the Non-Contributing Member. Any Capital Loan shall bear interest at a rate equal to four percent (4%) per annum over the Prime Rate, announced from time to time by Bank One. Thereafter, all Distributable Cash, Sale Proceeds or other proceeds which otherwise would be payable or distributable to the Non-Contributing Class C Member shall be made or distributed to the Contributing Class C Member making a Capital Loan until it has received from such sources an amount equal to the outstanding principal balance of the Capital Loan plus interest as aforesaid on the amount remaining from time to time outstanding, but in no event shall the interest rate exceed the maximum interest rate permitted by law. All funds so paid or distributed to the Contributing Class C Member as a result of a Capital Loan shall be applied first to accrued interest and then to principal.

In the event more than one Class C Member desires to make the required contribution on behalf of the Non-Contributing Class C Member, the Contributing Class C Members shall make pro rata contributions.

A Class C Member shall, at his or its option, make additional Capital Contributions to meet the expenses and obligations of the Company. This Section 8.2 shall not be deemed to be for the benefit of any person or entity other than the Members and the Company, and no such third person shall under any circumstances have any right to compel any actions or payments by the Managers and/or the Members. No Member shall be required to contribute any additional capital to the Company, and no Member shall have any personal liability for any obligation of the Company.

8.3    <u>Capital Accounts</u>.

14

(a)    A separate Capital Account will be maintained for each Member.  Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such contributed property that the Company is considered to assume or take subject to under Code Section 752); (3) allocations to such Member of Net Profits and Net Losses; and (4) allocations to such Member of income described in Code Section 705 (a)(1)(B).  Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); (3) allocations to such Member of expenditures described in Code Section 705(a)(2)(B); and (4) allocations to the account of such Member of Company loss and deduction as set forth in such Regulations, taking into account adjustments to reflect book value.

(b)    In the event of a permitted sale or exchange of a Membership Interest or an Economic Interest in the Company, the Capital Account of the transferor shall become the Capital Account of the transferee to the extent it relates to the transferred Membership Interest or Economic Interest in accordance with Section 1.704-1(b)(2)(iv) of the Treasury Regulations.

(c)    The manner in which Capital Accounts are to be maintained pursuant to this Section 8.3 is intended to comply with the requirements of Code Section 704(b) and the Treasury Regulations promulgated thereunder.  If the Company determines that the manner in which Capital Accounts are to be maintained pursuant to the preceding provisions of this Section 8.3 should be modified in order to comply with Code Section 704(b) and the Treasury Regulations, then notwithstanding anything to the contrary contained in the preceding provisions of this Section 8.3, the method in which Capital Accounts are maintained shall be so modified; provided, however, that any change in the manner of maintaining Capital Accounts shall not materially alter the economic agreement between or among the Members as set forth in the Limited Liability Company Agreement.

(d)    Upon liquidation of the Company (or any Member's Membership Interest or Economic Interest Owner's Economic Interest), liquidating distributions will be made in accordance with the positive Capital Account balances of the Members and Economic Interest Owners, as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs.  Liquidation proceeds will be paid within sixty (60) days of the end of the taxable year (but in no event later than one hundred twenty (120) days after the date of the liquidation).  The Company may offset damages for breach of this Limited Liability Company Agreement by a Member or Economic Interest Owner whose interest is liquidated (either upon the withdrawal of the Member or the liquidation of the Company) against the amount otherwise distributable to such Member.

(c)    Except as otherwise required in the Act (and subject to Section 8.1 and 8.2), no Member or Economic Interest Owner shall have any liability to restore all or any portion of a deficit balance in such Member's or Economic Interest Owner's Capital Account.

8.4    <u>Withdrawal or Reduction of Members' Contributions to Capital</u>.

(a)    A Member shall not receive out of the Company's property any part of its Capital Contribution until all liabilities of the Company, except liabilities to Members on account of their Capital Contributions, have been paid or there remains property of the Company sufficient to pay them.

(b)    A Member, irrespective of the nature of its Capital Contribution, has only the right to demand and receive cash in return for his or its Capital Contribution.

ARTICLE IX

<u>ALLOCATIONS, INCOME TAX, DISTRIBUTIONS, ELECTIONS AND REPORTS</u>

9.1    <u>Allocations of Profits and Losses from Operations</u>.  Subject to the requirements of Section 704(c) of the Code, each item of income, gain, loss, deduction or credit shall be allocated among the Members as follows:

(a)    Net Losses of the Company and any deductions not taken into account in determining the net income or net loss of the Company for each fiscal year of the Company shall be allocated among the Members as follows:

(i)    First, to the Members who have positive balances in their Capital Accounts, to the extent of and in proportion to such positive balances; and

(ii)    The balance, if any, to the Members in a prorata proportion to their respective Participating Percentages.

(b)    Net Profits and any credits not taken into account in determining net income or net loss of the Company for each fiscal year of the Company shall be allocated among the Members as follows:

(i)    First, to the Members who have deficit balances in their Capital Accounts, to the extent of and in proportion to such deficit balances; and

(ii)    The balance, if any, to the Members as provided in Section 9.3(iv)-(vii).

9.2    <u>Special Allocations to Capital Accounts</u>.  Notwithstanding Section 9.1 hereof:

16

(a)    No allocations of loss, deduction and/or expenditures described in Code Section 705(a)(2)(B) shall be charged to the Capital Accounts of any Member if such allocation would cause such Member to have a Deficit Capital Account. The amount of the loss, deduction and/or Code Section 705(a)(2)(B) expenditure which would have caused a Member to have a Deficit Capital Account shall instead be charged to the Capital Account of any Members which would not have a Deficit Capital Account as a result of the allocation, in proportion to his or its their respective Capital Contributions, or, if no such Members exist, then to the Members in accordance with his or its interests in Company profits pursuant to Section 9.1.

(b)    In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), (5), or (6) of the Treasury Regulations, which create or increase a Deficit Capital Account of such Member, then items of Company income and gain (consisting of a pro rata portion of each item of Company income, including gross income, and gain for such year and, if necessary, for subsequent years) shall be specially credited to the Capital Account of such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Deficit Capital Account so created as quickly as possible. It is the intent that this Section 9.2(b) be interpreted to comply with the alternate test for economic effect set forth in Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations.

(c)    In the event any Member would have a Deficit Capital Account at the end of any Company taxable year which is in excess of the sum of any amount that such Member is obligated to restore to the Company under Treasury Regulations Section 1.704-1(b)(2)(ii)(c) and such Member's share of minimum gain as defined in Section 1.704-2(g)(1) of the Treasury Regulations (which is also treated as an obligation to restore in accordance with Section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations), the Capital Account of such Member shall be specially credited with items of Membership income (including gross income) and gain in the amount of such excess as quickly as possible.

(d)    Notwithstanding any other provision of this Section 9.2, if there is a net decrease in the Company's minimum gain as defined in Treasury Regulation Section 1.704-2(d) during a taxable year of the Company, then, the Capital Accounts of each Member shall be allocated items of income (including gross income) and gain for such year (and if necessary for subsequent years) equal to that Member's share of the net decrease in Company minimum gain. This Section 9.2(d) is intended to comply with the minimum gain chargeback requirement of Section 1.704-2 of the Treasury Regulations and shall be interpreted consistently therewith. If in any taxable year that the Company has a net decrease in the company's minimum gain, if the minimum gain chargeback requirement would cause a distortion in the economic arrangement among the Members and it is not expected that the Company will have sufficient other income to correct that distortion, the Managers may in their discretion (and shall, if requested to do so by a Member) seek to have the Internal Revenue Service waive the minimum gain chargeback requirement in accordance with Treasury Regulation Section 1.704-2 (f)(4).

(e)     Items of Company loss, deduction and expenditures described in Code Section 705(a)(2)(B) which are attributable to any nonrecourse debt of the Company and are characterized as partner (Member) nonrecourse deductions under Section 1.704-2 (i) of the Treasury Regulations shall be allocated to the Members' Capital Accounts in accordance with Section 1.704-2(i) of the Treasury Regulations.

(f)     Beginning in the first taxable year in which there are allocations of "nonrecourse deductions" (as described in Section 1.704-2(b) of the Treasury Regulations) such deductions shall be allocated to the Members in accordance with, and as a part of, the allocations of Company profit or loss for such period.

(g)     In accordance with Code Section 704(c)(1)(A) and Section 1.704-1(b)(2)(i)(iv) of the Treasury Regulations, if a member contributes property with a fair market value that differs from its adjusted basis at the time of contribution, income, gain, loss and deductions with respect to the property shall, solely for federal income tax purposes, be allocated among the Members so as to take account of any variation between the adjusted basis of such property to the Company and its fair market value at the time of contribution.

(h)     Pursuant to Code Section 704(c)(1)(B) if any contributed property is distributed by the Company other than to the contributing Member within five years of being contributed, then, except as provided in Code Section 704(c) (2), the contributing Member shall be treated as recognizing gain or loss from the sale of such property in an amount equal to the gain or loss that would have been allocated to such Member under Code Section 704(c)(1)(A) if the property had been sold at its fair market value at the time of the distribution.

(i)     In the case of any distribution by the Company to a Member or Economic Interest Owner, such Member or Economic Interest Owner shall be treated as recognizing gain in an amount equal to the lesser of:

(1)     the excess (if any) of (A) the fair market value of the property (other than money) received in the distribution over (B) the adjusted basis of such Member's Membership Interest or Economic Interest Owner's Economic Interest in the Company immediately before the distribution reduced (but not below zero) by the amount of money received in the distribution, or

(2)     the Net Precontribution Gain (as defined in Code Section 737(b)) of the Member or Economic Interest Owner. The Net Precontribution Gain means the net gain (if any) which would have been recognized by the distributed Member or Economic Interest Owner under Code Section 704(c)(1)(B) of all property which (1) had been contributed to the Company within five years of the distribution, and (2) is held by the Company immediately before the distribution, if such property had been distributed by the Company to another Member or Economic Interest Owner. If any

18

portion of the property distributed consists of property which had been contributed by the distributee Member or Economic Interest Owner to the Company, then such property shall not be taken into account under this Section 9.2(i) and shall not be taken into account in determining the amount of the Net Precontribution Gain. If the property distributed consists of an interest in an entity, the preceding sentence shall not apply to the extent that the value of such interest is attributable to the property contributed to such entity after such interest had been contributed to the Company.

(j)    In connection with a Capital Contribution of money or other property (other than a de minimis amount) by a new or existing Member or Economic Interest Owner as consideration for an Economic Interest or Membership Interest, or in connection with the liquidation of the Company or a distribution of money or other property (other than a de minimis amount) by the Company to a retiring Member or Economic Interest Owner (as consideration for an Economic Interest or Membership Interest), the Capital Accounts of the Members shall be adjusted to reflect a revaluation of Company property (including intangible assets) in accordance with Treasury Regulation section 1.704-1(b)(2)(iv)(f). If, under Section 1.704-1(b)(2)(iv)(f) of the Treasury Regulations, Company property that has been revalued is properly reflected in the Capital Accounts and on the books of the Company at a book value that differs from the adjusted tax basis of such property, then depreciation, depletion, amortization and gain or loss with respect to such property shall be shared among the Members in a manner that takes account of the variation between the adjusted tax basis of such property and its book value, in the same manner as variations between the adjusted tax basis and fair market value of property contributed to the Company are taken into account in determining the Members' shares of tax items under Code Section 704(c).

(k)    All recapture of income tax deductions resulting from the sale or disposition of Company property shall be allocated to the Member or Members to whom the deduction that gave rise to such recapture was allocated hereunder to the extent that such Member is allocated any gain from the sale or other disposition of such property.

(l)    Any credit or charge to the Capital Accounts of the Members pursuant to Sections 9.2(b),(c), and/or (d), hereof shall be taken into account in computing subsequent allocations of profits and losses pursuant to Section 9.1, so that the net amount of any items charged or credited to Capital Accounts pursuant to Sections 9.1 and 9.2 shall, to the extent possible, be equal to the net amount that would have been allocated to the Capital Account of each Member pursuant to the provisions of this Article IX if the special allocations required by Sections 9.2(b), (c), and/or (d), had not occurred.

9.3    Distributions.   Distributable Cash and the Sale Proceeds shall be distributed in accordance with the following:

(i)    First, an amount sufficient to pay of all ordinary expenses of the Company;

19

(ii)    Second, an amount sufficient to pay currently due and payable debts of the Company;

(iii)    Third, an amount sufficient for the establishment of reserves deemed reasonable by the Manager;

(iv)    Fourth, an amount sufficient to repay to Class A Members and to repay to Class B Members their capital contributions to the Company, which amounts shall be allocated among the Class A Members and the Class B Members in proportion to their respective capital accounts as shown on Exhibit A;

(v)    Fifth, an amount sufficient to repay to Class C Members their capital contributions to the Company, which amounts shall be allocated among the Class C Members in proportion to their respective capital accounts as shown on Exhibit A.

(vi)    Sixth, an amount equal to the Class A Return to the Class A Members. Any deficiency in the distribution of the Class A Return, in any year, shall be carried forward into subsequent fiscal years until paid in full, without interest, but such payment is not guaranteed by the Manager or the Company

(vii)    Seventh, the balance shall be payable to Class C Members in proportion to their respective Class C Member Participating Percentages.

9.4    <u>Limitation Upon Distributions</u>.

(a)    No distributions or return of contributions shall be made and paid if, after the distribution or return of contribution is made, either:

(1)    the Company would be insolvent; or

(2)    the net assets of the Company would be less than zero.

(b)    The Manager may base a determination that a distribution or return of contribution may be made under Section 9.4(a) in good faith reliance upon a balance sheet and profit and loss statement of the Company represented to be correct by the person having charge of its books of account or certified by an independent public or certified public accountant or firm of accountants to fairly reflect the financial condition of the Company.

9.5    <u>Accounting Principles</u>. The profits and losses of the Company shall be determined in accordance with generally accepted accounting principles applied on a consistent basis using the method of accounting selected by the Managers.

9.6    <u>Interest On and Return of Capital Contributions</u>. No Member shall be entitled to interest on his or its Capital Contribution or to return of his or its Capital Contribution.

9.7     <u>Loans to Company</u>.  Nothing in this Limited Liability Company Agreement shall prevent any Member from making secured or unsecured loans to the Company by agreement with the Company.

9.8     <u>Accounting Period</u>.  The Company's accounting period shall be selected by the Managers or as required by law.

9.9     <u>Records, Audits and Reports</u>.  At the expense of the Company, the Manager shall maintain records and accounts of the operations and expenditures of the Company.  At a minimum the Company shall keep at its principal place of business the following records:

(a)     A current list of the full name and last known address of each Member and Economic Interest Owner setting forth the amount of cash each Member and Economic Interest Owner has contributed, a description and statement of the agreed value of the other property or services each Member and Economic Interest Owner has contributed or has agreed to contribute in the future, and the date on which each became a Member or Economic Interest Owner;

(b)     A copy of the Certificate of Formation of the Company and all amendments thereto, together with executed copies of any powers of attorney pursuant to which any amendment has been executed;

(c)     Copies of the Company's federal, state, and local income tax returns and reports, if any, for the three most recent years;

(d)     Copies of the Company's currently effective written Limited Liability Company Agreement;

(e)     Copies of any financial statements of the Company for the three most recent years;

(f)     Minutes of every annual, special meeting and court ordered meeting;

(g)     Any written consents obtained from Members for actions taken by Members without a meeting; and

(h)     Unless contained in the Certificate of Formation of the Limited Liability Company Agreement, a writing prepared by the Manager setting out the following:

(1)     The times at which or events on the happening of which any additional contributions agreed to be made by each Member and Economic Interest owner are to be made.

21

(2)      Any right of a Member or Economic Interest Owner to receive distributions that include a return of all or any part of the Member or Economic Interest Owner's contributions.

(3)      Any power of a Member or Economic Interest Owner to grant the right to become an assignee of any part of the Member's or Economic Interest Owner's interest, and the terms and conditions of the power.

9.10   <u>Returns and Other Elections</u>.  The Manager shall cause the preparation and timely filing of all tax returns required to be filed by the Company pursuant to the Code and all other tax returns deemed necessary and required in each jurisdiction in which the Company does business. Copies of such returns, or pertinent information therefrom, shall be furnished to the Members within a reasonable time after the end of the Company's fiscal year upon the Members written request. All elections permitted to be made by the Company under federal or state laws shall be made by the Manager in its sole discretion, provided that the Manager shall make any tax election permitted by law which is requested by Class C Members holding at least seventy-five percent (75%) of all of the Class C Participating Percentages.

9.11   Tax Matters Partner. Geoffrey W. Ruttenberg is designated the "Tax Matters Partner" (as defined in Code Section 6231), and is authorized and required to represent the Company (at the Company's expense) in connection with all examinations of the Company's affairs by tax authorities, including, without limitation, administrative and judicial proceedings, and to expend Company funds for professional services and costs associated therewith.  The Members agree to cooperate with each other and to do, or refrain from doing, any and all things reasonably required to conduct such proceedings.

# ARTICLE X

## TRANSFERABILITY

10.1   <u>General</u>.  Except as otherwise specifically provided herein, neither a Member nor an Economic Interest Owner shall have the right, as to all or any part of its Membership Interest or Economic Interest to:

(a)      sell, assign, pledge, hypothecate, transfer, exchange or otherwise transfer for consideration, (collectively, "sell"); or

(b)      gift, bequeath or otherwise transfer for no consideration (whether or not by operation of law, except in the case of bankruptcy).

10.2   <u>Right of First Refusal</u>.

(a)      Except as otherwise permitted under Section 10.4 hereof, if a Selling Member desires to sell all or any portion of its Membership Interest or Economic Interest in the

Company to a third party purchaser, the Selling Member shall obtain from such third party purchaser a bona fide written offer to purchase such interest, stating the terms and conditions upon which the purchase is to be made and the consideration offered therefor. The Selling Member shall give written notification to the remaining Class C Members, by certified mail or personal delivery, of its intention to so transfer such interest, furnishing to the remaining Class C Members a copy of the aforesaid written offer to purchase such interest.

(b)    The remaining Class C Members, and each of them shall, on a basis pro rata to their Participating Percentages, have the right to exercise a right of first refusal to purchase all (but not less than all) of the interest proposed to be sold by the Selling Member upon the same terms and conditions as stated in the aforesaid written offer to purchase by giving written notification to the Selling Member, by certified mail or personal delivery, of their intention to do so within thirty (30) days after receiving the written notice. The failure of at least one of the remaining Class C Members to so notify the Selling Member of their desire to exercise this right of first refusal within said thirty (30) day period shall result in the termination of the right of first refusal and the Selling Member shall be entitled to consummate the sale of its interest in the Company, to such third party purchaser, provided that the sale shall be consummated within sixty (60) days following the expiration of the aforesaid thirty (30) day period.

In the event the remaining Class C Members (or any one or more of the remaining Class C Members) give written notice to the Selling Member of their desire to exercise this right of first refusal and to purchase all of the Selling Member's interest in the Company which the Selling Member desires to sell upon the same terms and conditions as are stated in the aforesaid written offer to purchase, the remaining Class C Members shall have the right to designate the time, date and place of closing, provided that the date of closing shall be within sixty (60) days after giving written notification to the Selling Member of the remaining Class C Member or Class C Members election to exercise their right of first refusal.

(c)    As a condition to the Company recognizing the effectiveness of either the purchase of the Selling Member's interest in the Company by a third party purchaser or the gift of an interest in the Company (including an Economic Interest), and (subject to Section 10.3) substitution of a new Member, the remaining Class C Members may require the Selling Member, Gifting Member or the proposed purchaser, donee or successor-in-interest, as the case may be, to execute, acknowledge and deliver to the remaining Class C Members such instruments of transfer, assignment and assumption and such other certificates, representations and documents, and to perform all such other acts which the remaining Class C Members may deem necessary or desirable to:

(i)    verify the purchase, gift or transfer, as the case may be;

(ii)    confirm that the person desiring to acquire an interest in the Company, or to be admitted as a Member, has accepted, assumed and agreed to be subject and

23

bound by all of the terms, obligations and conditions of the Limited Liability Company Agreement, (whether such Person is to be admitted as a new Member or an Economic Interest Owner);

(iii)    maintain the status of the Company as a partnership for federal tax purposes; and

(iv)    assure compliance with any applicable state and federal laws including securities laws and regulations.

(d)    Any sale or gift of a Membership Interest or Economic Interest or admission of a Member in compliance with this Article X shall be deemed effective as of the last day of the calendar month in which the remaining Class C Members' consent thereto was given, or, if no such consent was required pursuant to Section 10.2(e), then on such date that the donee or successor interest complies with the conditions set forth in Section 10.2(c). The Selling Member agrees, upon request of the remaining Class C Members, to execute such certificates or other documents and to perform such other acts as may be reasonably requested by the remaining Class C Members from time to time in connection with such sale, transfer, assignment, or substitution. The Selling Member hereby indemnifies the Company and the remaining Class C Members against any and all loss, damage, or expense (including, without limitation, tax liabilities or loss of tax benefits) arising directly or indirectly as a result of any transfer or purported transfer in violation of this Article X.

(e)    Subject to Section 10.3(c), a Transferring Member may gift all or any portion of its Membership Interest and Economic Interest (without regard to Section 10.2(a) and (b) provided that the donee or other successor-in-interest (collectively, "donee") complies with Section 10.2(c) and further provided that the donee is a member of the Gifting Member's Family.

10.3    <u>Transferee Not Member in Absence of Class C Member's Unanimous Consent</u>

(a)    Notwithstanding anything contained herein to the contrary (including, without limitation, Section 10.2 hereof), if all of the remaining Class C Members do not approve, by written consent, of the proposed sale or gift of the Transferring Member's Membership Interest or Economic Interest to a transferee or donee which is not a Member immediately prior to the sale or gift, then the proposed transferee or donee shall have no right to participate in the management of the business and affairs of the Company or to become a Member. The transferee or donee shall be merely an Economic Interest Owner. No transfer of a Member's interest in the Company (including any transfer of the Economic Interest or any other transfer which has not been approved by unanimous written consent of the remaining Class C Members) shall be effective unless and until written notice (including the name and address of the proposed, transferee or donee and the date of such transfer) has been provided to the Company and the nontransferring Member(s).

24

(b)     Upon and contemporaneously with any sale or gift of a Transferring Member's Economic Interest in the Company which does not at the same time transfer the balance of the rights associated with the Economic Interest transferred by the Transferring Member (including, without limitation, the rights of the Transferring Member to participate in the management of the business and affairs of the Company), all remaining rights and interests which were owned by the Transferring Member immediately prior to such sale or gift or which were associated with the transferred Economic Interest shall immediately lapse until either (1) the Class C Members, by unanimous written consent, reinstate such rights to the Economic Interest Owner who did not previously obtain the unanimous written consent of the Members or (2) upon the Class C Members, by unanimous written consent, reinstating such rights to a successor or transferee of such Economic Interest Owner.

(c)     The restrictions on transfer contained in this Section 10.3 are intended to comply (and shall be interpreted consistently) with the restrictions on transfer set forth in Article 30 of the Act.

10.4     Transfers to Affiliates, Members and Member's Family. Notwithstanding anything contained herein to the contrary, any Member may at any time, and from time to time, transfer all, or any portion of, or any interest in, the Member's Participating Percentage or Economic Interest to (i) any other Member; (ii) any Affiliate of a Member; or (iii) any member of the Member's Family. No Member may transfer a Participating Percentage or Economic Interest permitted under this Section 10.4 unless the following conditions are satisfied:

(a)     the transfer will not require registration of Participating Percentages under any federal or state securities laws;

(b)     the transferee delivers to the Company a written agreement to be bound by the terms of this Agreement;

(c)     the transfer will not result in the termination of the Company pursuant to Code Section 708; and

(d)     the transfer will not result in the Company being subject to the Investment Company Act of 1940, as amended.

### ARTICLE XI

### ADDITIONAL MEMBERS

From the date of the formation of the Company, any Person or Entity acceptable to the Class C Members holding at least seventy-five percent (75%) of the Class C Participating Percentages may become a Member in this Company either by the issuance by the Company of Membership Interests for such consideration as the Class C Members holding at least seventy-five percent (75%) of the Class C Participating Percentages shall determine, or as a transferee of a Member's Membership

Interest or any portion thereof, subject to the terms and conditions of this Limited Liability Company Agreement. No new Members shall be entitled to any retroactive allocation of losses, income or expense deductions incurred by the Company. The Manager may, at its option, at the time a Member is admitted, close the Company books (as though the Company's tax year had ended) or make pro rata allocations of loss, income and expense deductions to a new Member for that portion of the Company's tax year in which a Member was admitted in accordance with the provisions of Code Section 706(d) and the Treasury Regulations promulgated thereunder.

## ARTICLE XII

## DISSOLUTION AND TERMINATION

12.1    Dissolution.

(a)    The Company shall be dissolved upon the occurrence of any of the following events:

(i)    When the period fixed for the duration of the company shall expire pursuant to Section 2.5 hereof;

(ii)    by the unanimous written agreement of all Class C Members; or

(iii)    upon the death, expulsion, bankruptcy or dissolution of a Member or occurrence of any other event which terminates the continued membership of a Member in the Company (a "Withdrawal Event"), unless the business of the Company is continued by the consent of all the remaining Class C Members within ninety (90) days after the Withdrawal Event and there are at least two remaining Class C Members. Each of the Class C Members hereby agrees that within sixty (60) days after the occurrence of a Withdrawal Event, they will promptly decide whether to consent, in writing, to continue the business of the Company. Each of the remaining Class C Members further agrees promptly to decide whether consent, in writing, to continue the business of the Company upon a sale or gift either of a Member's entire Economic Interest to which all of the remaining Class C Members do not consent within forty-five (45) days after the occurrence of such a sale or gift or upon a sale or gift of a Transferring Member's entire Membership Interest. Such determination of whether consent has been granted shall be mailed or hand delivered to the principal place of business of the Company set forth in Section 2.3 hereof (or to such other address designated by the Managers) no later than fifty (50) days after each Withdrawal Event or transfer by Member of its entire Economic Interest or Membership Interest). The sole remedy for breach of a Member's obligation to consent to continue the business of the Company under this Section shall be money damages (and not specific performance).

26

(b)    Notwithstanding anything to the contrary in this Limited Liability Company Agreement, if the Class C Members holding at least seventy-five percent (75%) of all of the Class C Participating Percentages vote to dissolve the Company at a meeting of the Company pursuant to Article VII, then all of the Members shall agree in writing to dissolve the Company on the date agreed upon or in the event of no agreement, as soon as possible, but in any event not more than thirty (30) days thereafter.

(c)    If a Member who is an individual dies or a court of competent jurisdiction adjudges him to be incompetent to manage his person or his property, the Member's executor, administrator, guardian, conservator, or other legal representative may exercise all of the Member's rights for the purpose of settling his estate or administering his property.

(d)    Except as expressly permitted in this Limited Liability Company Agreement, a Member shall not voluntarily resign or take any other voluntary action which directly causes a Withdrawal Event. Unless otherwise approved by Members owning a majority of the Participating Percentages, a Member who resigns (a "Resigning Member") or whose Membership Interest is otherwise terminated by virtue of a Withdrawal Event, regardless of whether such Withdrawal Event was the result of a voluntary act by such Member, shall not be entitled to receive any distributions to which such Member would have been entitled had such Member remained a Member. Except as otherwise expressly provided herein, a Resigning Member shall immediately become an Economic Interest Owner. Damages for breach of this Section 12.1(d) shall be monetary damages only (and not specific performance), and such damages may be offset against distributions by the Company to which the Resigning Member would otherwise be entitled.

12.2    <u>Winding Up, Liquidation and Distribution of Assets</u>.

(a)    Upon dissolution, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution. The Managers shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Managers shall:

(1)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable (except to the extent the Managers may determine to distribute any assets to the Members in kind),

(2)    Allocate any profit or loss resulting from such sales to the Members' and Economic Interest Owners' Capital Accounts in accordance with Article IX hereof,

(3)    Discharge all liabilities of the Company, including liabilities to Members and Economic Interest Owners who are creditors, to the extent otherwise permitted by law, other than liabilities to Members and Economic Interest Owners for distributions, and establish such Reserves as may be reasonably necessary to provide for contingent claims or liabilities of the Company, provided that for purposes of determining the Capital Accounts of the Members and Economic Interest Owners, the amounts of such Reserves shall be deemed to be an expense of the Company,

(4)    Distribute the remaining assets in the following order:

(i)    If any assets of the Company are to be distributed in kind, the net fair market value of such assets as of the date of dissolution shall be determined by independent appraisal or by agreement of the Class C Members holding at least seventy-five percent (75%) of all of the Class C Participating Percentages. Such assets shall be deemed to have been sold as of the date of dissolution for their fair market value, and the Capital Accounts of the Members and Economic Interest owners shall be adjusted pursuant to the provisions of Article IX and Section 8.3 of this Limited Liability Company Agreement to reflect such deemed sale.

(ii)    The positive balance (if any) of each Member's and Economic Interest Owner's Capital Account (as determined after taking into account all Capital Account adjustments for the Company's taxable year during which the liquidation occurs) shall be distributed to the Members, either in cash or in kind, as determined by the Managers, with any assets distributed in kind being valued for this purpose at their fair market value as determined pursuant to Section 12.2(b)(4)(i). Any such distributions to the Members in respect of their Capital Accounts shall be made in accordance with the time requirements set forth in Section 1.704-1(b)(2)(ii)(b)(2) of the Treasury Regulations.

(c)    Notwithstanding anything to the contrary in this Limited Liability Company Agreement, upon a liquidation within the meaning of Section 1.704-1(b) (2) (ii) (g) of the Treasury Regulations, if any Member has a Deficit Capital Account (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make any Capital Contribution, and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other Person for any purpose whatsoever.

d)    Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

28

(e)    The Manager shall comply with all requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

12.3    Certificate of Cancellation.    When all debts, liabilities and obligations of the Company have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets of the Company have been distributed, certificate of cancellation as required by the Act, shall be executed in duplicate and filed with the Delaware Secretary of State.

12.4    Effect of Filing of Certificate of Cancellation.    Upon the filing of certificate of cancellation with the Delaware Secretary of State, the existence of the Company shall cease, except for the purpose of suits, other proceedings and appropriate action as provided in the Act.    The Manager shall have authority to distribute any Company property discovered after dissolution, convey real estate and take such other action as may be necessary on behalf of and in the name of the Company.

12.5    Return of Contribution Nonrecourse to Other Members.    Except as provided by law or as expressly provided in this Limited Liability Company Agreement, upon dissolution, each Member shall look solely to the assets of the Company for the return of its Capital Contribution.    If the Company property remaining after the payment or discharge of the debts and liabilities of the Company is insufficient to return the cash contribution of one or more Members, such Member or Members shall have no recourse against any other Member, except as otherwise provided by law.

ARTICLE XIII

AGREEMENTS WITH MANAGER, MEMBERS AND AFFILIATES

13.1    Services Rendered by Manager.    The Manager shall be entitled to reimbursement for legal and accounting services provided by the Manager or its Affiliates.

13.2    Treatment of Fees.    None of the payments under this Article shall be treated as a payment or partial payment of the distributions to which any Member is to receive pursuant to this Agreement.

ARTICLE XIV

MISCELLANEOUS PROVISIONS

14.1    Notices. Any notice, demand, or communication required or permitted to be given by any provision of this Limited Liability Company Agreement shall be deemed to have been sufficiently given or served for all purposes if (a) either by actual delivery of the notice into the hands of the parties thereunto entitled; (b) or by the mailing of the notice in the U.S. mail, certified mail, return receipt requested; or (c) sent by nationally recognized, overnight delivery service, addressed to the Member's and/or Company's address, as appropriate, which is set forth in this

29

Limited Liability Company Agreement. The notice shall be deemed to be received in case (a) on the date of its actual receipt by the party entitled thereto and in cases (b) or (c) on the date of its mailing or deposit with such delivery service. The failure or refusal of any party to accept any notice given pursuant to this Section 14.1 shall be conclusively deemed receipt thereof and knowledge of its contents.

14.2    Books of Account and Records. Proper and complete records and books of account shall be kept or shall be caused to be kept by the Managers in which shall be entered fully and accurately all transactions relating to the Company's business in such detail and completeness as is customary and usual for businesses of the type engaged in by the Company. Such books and records shall be maintained as provided in Section 9.9. The books and records shall at all times be maintained at the principal place of business of the Company.

14.3    Arbitration. Should any controversy arise among the parties hereto concerning the Company or the rights or duties of any party under this Agreement, the controversy shall be settled exclusively by arbitration in accordance with the rules of the American Arbitration Association. Each party to this Agreement shall select and appoint one arbitrator. The decision in writing of any tow of the arbitrators so appointed shall be binding on all parties to this Agreement. Should any party to this Agreement fail to appoint an arbitrator within fifteen (15) days after receiving written notice from another party to do so, the arbitrator(s) appointed by the remaining parties shall act for all parties and his or her decision shall be binding and conclusive on all parties hereto. The cost, expenses and fees of the arbitrators shall be borne by the parties hereto equally or may be assessed by the arbitrators, in whole or in part, against any one or more parties.

14.4    Application of Delaware Law. This Limited Liability Company Agreement and its interpretation shall be governed exclusively by its terms and by the laws of the State of Delaware, and specifically the Act.

14.5    Amendments. This Limited Liability Company Agreement may not be amended except in writing by the affirmative vote of all Class C Members holding at least seventy-five percent (75%) of all of the Class C Participation Percentages. Any amendment changing the Participating Percentage of the Members requires the unanimous vote of the Class C Members.

14.6    Execution of Additional Instruments. Each Member hereby agrees to execute such other and further statements of interest and holdings, designations and other instruments necessary to comply with any laws, rules or regulations.

14.7    Construction. Whenever the singular number is used in this Limited Liability Company Agreement and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.

14.8    Headings. The headings in this Limited Liability Company Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of this Limited Liability Company Agreement or any provision hereof.

14.9    <u>Waivers</u>. The failure of any party to seek redress for default of or to insist upon the strict performance of any covenant or condition of this Limited Liability Company Agreement shall not prevent a subsequent act, which would have originally constituted a default, from having the effect of an original default.

14.10    <u>Rights and Remedies Cumulative</u>. The rights and remedies provided by this Limited Liability Company Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any other remedy. Said rights and remedies are given in addition to any other legal rights the parties may have.

14.11    <u>Severability</u>. If any provision of this Limited Liability Company Agreement or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Limited Liability Company Agreement and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

14.12    <u>Heirs, Successors and Assigns</u>. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Limited Liability Company Agreement, their respective heirs, legal representatives, successors and assigns.

14.13    <u>Creditors</u>. None of the provisions of this Limited Liability Company Agreement shall be for the benefit of or enforceable by any creditors of the Company.

14.14    <u>Counterparts</u>. This Limited Liability Company Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

[Signature Page Follows]

IN WITNESS WHEREOF, the undersigned have executed this Agreement as of the date first set forth above.

## CLASS A MEMBERS:

Name: ~201 E. WALTON PARTNERSHIP~
Address: ~c/o SCHATZ PROPERTIES~
~610 N. FAIRBANKS CT~
~CHICAGO, IL 60611~
SSN: ~736-2872655~

Name:
Address

SSN:

Name:
Address

SSN:

## CLASS B MEMBER

CHICAGO DEVELOPMENT II LLC,
an Illinois limited liability company

By: ~[signature]~
Name: ~NOAH SCHATZ~
Its: ~MGR~
Address: ~c/o SCHATZ PROPERTIES~
~610 N. FAIRBANKS CT CHGO, IL 60611~
FEIN: ~20-1862986~

## CLASS C MEMBERS
32

GWR INVESTMENT, LLC,
an Illinois limited liability company

By: _____

Name:      Geoffrey W. Ruttenberg
Its:       Member
Address:   1246 West George Street
           Chicago, Illinois 60657

FEIN:      20-1588967


CHICAGO'S PREFERRED REALTORS LLC,
an Illinois limited liability company

By: _____
Name: Meredith Merks
Its: Manager
Address: 1309 South Place
         Chicago Il 60610
FEIN: 90-0137709


CHICAGO DEVELOPMENT II LLC,
an Illinois limited liability company

By: _____
Name: NOAH SCHATZ
Its: Principle + Man
Address: 610 N. FAIRBANKS C
         CAGO 60611
FEIN: 20-1862986


CHICAGO DEVELOPMENT II LLC,
an Illinois limited liability company

By: _____
By: _____
Name: NOAH SCHATZ
Its: Princ + Man
Address: 610 N. FAIRBANKS C
         CAGO 60611
FEIN: 20-1862798


**MANAGER**


THE BRIXTON GROUP, LTD.,
an Illinois corporation

By: _____
Name: Geoffrey W. Ruttenberg
Its:   President


33

EXHIBIT A

MEMBERS AND THEIR PARTICIPATING PERCENTAGES AND
<u>CAPITAL CONTRIBUTIONS</u>

| <u>Name</u> | Initial Capital <u>Contribution</u> | Class Participating <u>Percentage</u> |
|---|---|---|
| <u>CLASS A MEMBERS</u> | | |
| Class A Member Total | $ | 100% |
| <u>CLASS B MEMBERS</u> | | |
| Class B Member Total | $7,000,000 | 100% |
| Chicago Development II LLC | $7,000,000 | 100% |
| <u>CLASS C MEMBER</u> | | |
| Class C Member Total | $ | 100% |
| GWR Investment LLC | $ | 30% |
| Chicago Development II LLC | $ | 30% |
| Chicago Development III LLC | $ | 10% |
| Chicago's Preferred Realtors LLC | $ | 30% |

34

EXHIBIT B

LEGAL DESCRIPTION OF AIR RIGHTS

THAT PART OF LOTS 19 TO 23 BOTH INCLUSIVE IN BLOCK 1 IN THE SUBDIVISION OF BLOCK 31 IN KINZIER'S ADDITION TO CHICAGO IN SECTION 10, TOWNSHIP 39 NORTH, RANGE 14 EAST OF THE THIRD PRINCIPAL MERIDIAN, LYING ABOVE A HORIZONTAL PLANE OF 68.50 FEET ABOVE THE CHICAGO CITY DATUM, IN COOK COUNTY, ILLINOIS.